## CONTINUATION OF SEARCH WARRANT

I, Alex Travers, being duly sworn, do hereby state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this continuation in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search for information associated with certain cell phone numbers: 906-458-2328, utilized by Eugene Walter-George Rantanen (hereafter "Rantanen") (**SUBJECT ACCOUNT 1**); and 906-201-2726, utilized by Alicia Rantanen (hereafter "Alicia") (**SUBJECT ACCOUNT 2**), that are stored at premises controlled by Verizon, a wireless telephone service provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey 07921. The information to be searched is described in the following paragraphs and in Attachment A.

2. This continuation is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Verizon to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

3. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed since 2022. I am currently assigned to the Detroit Division, Marquette Resident Agency. Prior to my employment with the FBI, I was a police officer for over eight (8) years in Cranston, Rhode Island where I served as a

patrol officer, in temporary assignments with the department's Special Investigations Unit, and as a patrol sergeant.

4.  My duties include the investigations of various violations of federal criminal law, including matters involving violations of:

   a. 18 U.S.C. §§ 1111, 1151, 1153—murder;

   b. 18 U.S.C. §§ 1112, 1151, 1153—manslaughter;

   c. 18 U.S.C. §§ 113(a)(6), 1151, 1153—assault resulting in serious bodily injury; and

   d. 18 U.S.C. §§ 1151, 1153, Mich. Comp. Law § 750.136b(2), child abuse – first degree.

5.  The facts in this continuation come from my personal observations, my training and experience, and information obtained from other agents, other law enforcement officers, and witnesses. This continuation is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.  I submit that this continuation shows there is probable cause to believe that Rantanen committed the crimes of:

   a. 18 U.S.C. §§ 1111, 1151, 1153—murder;

   b. 18 U.S.C. §§ 1112, 1151, 1153—manslaughter;

   c. 18 U.S.C. §§ 113(a)(6), 1151, 1153—assault resulting in serious bodily injury; and

   d. 18 U.S.C. §§ 1151, 1153, Mich. Comp. Law § 750.136b(2), child abuse –

first degree.

Further, I submit that there is probable cause to believe the evidence to be searched for and seized, as described in Attachments A and B, is evidence of the crimes under investigation.

7. I have reason to believe that a search of Verizon records for **SUBJECT ACCOUNT 1** and **SUBJECT ACCOUNT 2** may contain evidence identifying and linking Rantanen and possible witness(es) to the crimes of 18 U.S.C. §§ 1111, 1151, 1153, 18 U.S.C. §§ 1112, 1151, 1153, 18 U.S.C. §§ 113(a)(6), 1151, 1153, Mich. Comp. Law § 750.136b(2), 18 U.S.C. §§ 1151, 1153.

## **PROBABLE CAUSE**

8. I am informed by the Unites States Attorney's Office that murder under 18 U.S.C. § 1111 includes felony murder, which requires the following elements:

   a. The suspect caused the death of the victim;

   b. The death resulted from the knowing or intentional perpetration of child abuse; and

   c. The suspect is an Indian; and

   d. The offense occurred in Indian Country.

9. I am informed by the Unites States Attorney's Office that murder under 18 U.S.C. § 1111 also includes second-degree murder, which requires the following elements:

   a. The suspect caused the death of the victim;

3

    b. The defendant acted with malice aforethought[1]; and

    c. The suspect is an Indian; and

    d. The offense occurred in Indian Country.

10. I am informed that to establish the offense of manslaughter, the following elements are required:

    a. The suspect caused the death of the victim;

    b. The killing was without malice;

    c. The suspect is an Indian; and

    d. The offense occurred in Indian Country.

11. I am informed by the United States Attorney's Office that to establish the charge of assault resulting in serious bodily injury for a crime committed by an Indian within Indian Country, the following elements must be met:

    a. The suspect assaulted the victim;

    b. The assault resulted in serious bodily injury;

    c. The suspect is an Indian; and

    d. The offense occurred in Indian Country.

12. I am informed by the United States Attorney's Office that to establish the charge of child abuse – first degree by an Indian within Indian Country, the following elements must be met:

---

[1] The government can prove malice aforethought several ways including by showing that defendant acted with recklessness that "demonstrated an *extreme* disregard for human life." *United States v. Sheffey*, 57 F.3d 1419, 1430 (6th Cir. 1995).

    a. First, that suspect is the parent or guardian of the child or that suspect had care or custody of or authority over the child when the abuse allegedly happened, regardless of the length of time the child was cared for by, in the custody of, or subject to the authority of that person.

    b. Second, that the suspect knowingly or intentionally caused serious physical harm or serious mental harm to a child.

        i. "Serious physical harm" means any physical injury to a child that seriously impairs the child's health or physical well-being, including, but not limited to, brain damage, a skull or bone fracture, subdural hemorrhage or hematoma, dislocation, sprain, internal injury, poisoning, burn or scald, or severe cut.

        ii. "Serious mental harm" means an injury to a child's mental condition that results in visible signs of an impairment in the child's judgment, behavior, ability to recognize reality, or ability to cope with the ordinary demands of life.

    c. The child was at the time under the age of 18.

    d. The suspect is an Indian.

    e. The offense occurred in Indian Country.

13. The residence, 16385 Skanee Road, L'Anse, Michigan 49946, where the incident occurred, is located within the exterior boundaries of the L'Anse Reservation of the Keweenaw Bay Indian Community, a federally recognized tribe, which the United States Attorney's Office informs me makes it Indian Country as defined by

5

federal law. The residence is located within the Northern Division of the Western District of Michigan. Rantanen is an enrolled member of the Keweenaw Bay Indian Community and is an Indian for purposes of federal law.

14. On February 19, 2024, at approximately 7:01 p.m., police responded to a 9-1-1 call at 16385 Skanee Road, L'Anse, Michigan 49946. The caller, Rantanen, reported that Victim, who was approximately a year and a half old, was not responsive. Police and emergency medical services responded to the residence. Rantanen and Victim were the only occupants of the residence when first responders arrived.

15. In the 9-1-1 call made by Rantanen, he reported he found Victim not breathing. Rantanen told the dispatcher that Victim was slumped over the bed and not breathing. Rantanen left Victim on the bed for a nap. Rantanen told the dispatcher that he observed cuts on Victim's tongue. Rantanen updated the dispatcher that Victim started breathing, but Victim's breathing was irregular.

16. In the 9-1-1 call, Rantanen identified the phone number that he was calling from as 906-458-2328 (**SUBJECT ACCOUNT 1**). Additionally, first responders can be heard in the background of the 9-1-1 call rendering aid to Victim including instructions from an automated external defibrillator. I reviewed police body camera footage. In the footage, I observed a cell phone on a highchair in the living room where responders were rendering aid to Victim. The cell phone appeared to be on speaker and on the line with 9-1-1.

6



*Figure 1*

17. In the body camera footage, Rantanen gestured towards this cell phone and asked a police officer to hand Rantanen his cell phone. The police officer retrieved the phone and handed it to Rantanen.

18. It appeared that Rantanen then made a phone call to someone who I believe to be his wife, Alicia. Rantanen referred to the person as "babe" and instructed the person to come home. A police officer instructed Rantanen to have her meet him at the hospital.

19. Medical services transported Victim to Baraga County Memorial Hospital, then to Hospital Sisters Health System St. Vincent Hospital in Green Bay, Wisconsin. According to medical records, medical staff observed at least eight (8) bruises on Victim's back, two (2) on front of Victim's trunk, and bruising on Victim's forehead. Medical staff reported a Computed Tomography (CT) scan of Victim's head revealed an acute subdural hematoma and midline shift. Based on information from

the Scottish Acquired Brain Injury Network,[2] "Midline shift refers to a shift (displacement) of brain tissue across the centre line of the brain. It may occur following traumatic brain injury in association with raised intracranial pressure or an intracranial haematoma which can push the brain towards one side causing midline shift."

20. Rantanen told first responders that he left Victim alone in a room, and when Rantanen returned, Victim was unresponsive.

21. FBI SA Richard Grout interviewed a doctor who spoke to Rantanen and Alicia at BCMH. Rantanen told the doctor that Victim was fine when Victim was put down for a nap. Rantanen came back five minutes later and observed Victim sitting up, slumped over, and limp. Rantanen picked up Victim, noticed Victim was not breathing at all, and called 9-1-1. Victim started breathing during the 9-1-1 call. Prior to Rantanen finding Victim like this, Victim was acting and eating normally and otherwise doing well. According to Rantanen, Victim was sick with a respiratory illness and was scheduled for follow-up in the near future. Rantanen did not mention anyone else being present with him and Victim during the incident. Alicia told the doctor that she last saw Victim around 4 p.m. that day when she came home between work shifts. She said "hi" to Rantanen and Victim, then went to work. At the time, Victim was eating and doing well. Alicia did not mention anyone else being in the

---

[2] https://www.acquiredbraininjury-education.scot.nhs.uk/what-is-acquired-brain-injury/traumatic-brain-injury/brain-shift-and-herniation/#:~:text=Midline%20shift%20refers%20to%20a,one%20side%20causing%20midline%20shift.

home. The doctor stated that Rantanen and Alicia were together when they spoke to the doctor.

22. Later, Rantanen reported to medical staff at St. Vincent's that he was with Victim most of the day, but not between noon and 4 p.m., when he went to pick up his wife. Rantanen reported that Victim was in the care of several of Victim's older stepsiblings. Rantanen reported that at approximately 5 p.m., Rantanen put Victim down for a nap and Rantanen later went into the room and noted that Victim was slumped over, limp, and not breathing. No known trauma was reported except for the bruise and swelling of Victim's forehead noted the week prior to presentation.

23. Victim was transported to Milwaukee Campus – Children's Wisconsin, in Milwaukee, Wisconsin. Medical staff observed bruising to Victim's head, torso, scrotum, and buttocks. Medical staff reported that Victim's injuries were consistent with trauma, Victim was showing little signs of life, and signs of abusive head trauma (AHT). Based on a meeting between with medical staff at Children's Wisconsin, the child was not likely to recover, and was likely to die unless kept on life support. I spoke with a doctor providing care to Victim, who said that the observed injuries were consistent with those they would expect to see when a child without proper safety restraints is in a car accident.

24. According to the Centers for Disease Control and Prevention[3]:

Abusive head trauma (AHT), which includes shaken baby syndrome, is a

---

[3] https://www.cdc.gov/violenceprevention/childabuseandneglect/Abusive-Head-Trauma.html

9

preventable and severe form of physical child abuse that results in an injury to the brain of a child. AHT often happens when a parent or caregiver becomes angry or frustrated because of a child's crying. It is caused by violent shaking and/or with blunt impact. The resulting injury can cause bleeding around the brain or on the inside back layer of the eyes.

25.     Based on my training and experience and conversations with investigators and medical professionals, the injuries and marks observed on Victim are consistent with non-accidental trauma caused by someone other than the Victim.

26.     I reviewed documentation from the Keweenaw Bay Indian Community Tribal Court which found that Rantanen is the uncontested biological and legal father of Victim.

27.     On February 20, 2024, the FBI, Keweenaw Bay Tribal Police, and Michigan State Police Crime Scene Response Team executed a federal search warrant at 16385 Skanee Road. (See *In re The Entire Property located at 16385 Skanee Rd, L'Anse, MI 49946*, 2:24-mj-00009-MV, filed in the Northern Division of the Western District of Michigan.)

28.     During the execution of the warrant, I observed a Jeep Wrangler bearing Keweenaw Bay Indian Community registration L856 (Vehicle Identification Number: 1C4BJWFG6CL282287) parked in the driveway:



*Figure 2*

29.  The Keweenaw Bay Indian Community Director of Motor Vehicle and Enrollment reported that Keweenaw Bay Indian Community registration L856 is registered to Rantanen.

30.  On February 22, 2024, investigators had another meeting with medical staff at Children's Wisconsin and learned from medical staff, the current findings represent the highest-level concern for non-accidental trauma.

31.  On February 22, 2024, the FBI arrested Rantanen at Children's Wisconsin pursuant to an arrest warrant for violations of 18 U.S.C. §§ 113(a)(6), 1151, 1153, assault resulting in serious bodily injury, and 18 U.S.C. §§ 1151, 1153, Mich. Comp. Law § 750.136b(3)(b), child abuse – second degree. (See *United States v. Eugene Walter-George Rantanen*, 2:24-mj-00010-MV, filed in the Northern Division of the Western District of Michigan.)

32.  The FBI seized Rantanen's cell phone incident to arrest, and I obtained

11

a search warrant for the phone [See *In re SUBJECT DEVICE 1*, 24-802M(NJ) filed in the Eastern District of Wisconsin]. Pursuant to the warrant, the cell phone was turned over to the Michigan State Police Computer Crimes Unit for forensic examination.

33. On February 24, 2024, I was informed that Victim was pronounced deceased. On February 27, 2024, an autopsy was performed at the Milwaukee County Medical Examiner's Office. The final autopsy report is pending.

34. I reviewed medical records from Children's Wisconsin. The medical records included the following:

Father provided no history that would be explanatory of any of (Victim's) findings, reporting that he had been mildly ill with viral upper respiratory symptoms the week prior but was laid down in good health (taking food normally prior to 1600 on 2/19/24) and found him "limp and not breathing" some time later. The absence of any explanatory trauma history, along with the overall extent, severity, and distribution of (Victim's) injuries (leading to (Victim's) subsequent death) is diagnostic of child physical abuse and pediatric abusive head trauma. The intracranial injuries, spinal cord injury, retinal hemorrhages, rib fractures, and multiple bruising areas are inconsistent with normal play, handling, and care of a child or common household accidents such as a short fall. These injuries are also not the consequence of any viral illness, including RSV or coronavirus.

35. Investigators obtained surveillance footage from the Ojibwa Casino in

12

Baraga, Michigan, one of Alicia's employers, from February 19, 2024. According to the surveillance footage, a Jeep Wrangler picked up Alicia from the casino at approximately 3:42 p.m.:



*Figure 3*

36.     As previously mentioned, Rantanen told medical staff at St. Vincent's Hospital that he was with Victim most of the day, but not between noon and 4 p.m., when he went to pick up his wife. Based on this, I believe that Rantanen is the operator of the vehicle shown in *Figure 3*. According to Google Maps, it takes approximately fourteen (14) minutes to drive from Rantanen's residence to the Ojibwa Casino.

37.     Open-source databases—specifically Accurint, Clear, and Experian—associate 906-201-2726 (**SUBJECT ACCOUNT 2**) with Alicia Rantanen, also known as Alicia Cribbs, since approximately October 2022. **SUBJECT ACCOUNT 2** is

listed as the phone number for Alicia Cribbs on a personal automobile insurance claim in October 2022. Subscriber information received from Verizon listed only Tracfone, a prepaid phone service reseller. Additionally, a review of call records for **SUBJECT ACCOUNT 1** indicated on February 19, 2024 at 7:17 p.m., there was a 15 second outgoing call to **SUBJECT ACCOUNT 2**, which matches the approximate time and duration of the call captured by the body camera footage referenced in Paragraph 18.

38. Investigators queried a telecommunications database which identified **SUBJECT ACCOUNT 1** and **SUBJECT ACCOUNT 2** as belonging to Verizon. On February 21, 2024, investigators sent a preservation request to Verizon for **SUBJECT ACCOUNT 1** and **SUBJECT ACCOUNT 2**.

39. On March 19, 2024, a federal grand jury returned an indictment which charged Rantanen with murder in violation of 18 U.S.C. §§ 1111(a), (b), (c)(2), (c)(3), 1151, 1153(a) and first-degree child abuse in violation of 18 U.S.C. §§ 1151, 1153(a), (b), 13, Mich. Comp. Laws § 750.136b(1)(a), (d), (f), (g), Mich. Comp. Laws § 750.136b(2).

40. I believe that a search of the records within the possession, custody, or control of Verizon related to **SUBJECT ACCOUNT 1** and **SUBJECT ACCOUNT 2** will provide investigators with information regarding Rantanen and Alicia's whereabouts on the day of the incident which could corroborate or disprove Rantanen's statements to medical staff. Additionally, this information could lead to the identification of other potential witnesses.

41. I submit there is probable cause to believe the crimes under investigation were committed. Regarding all of these crimes, Rantanen is an Indian and the residence where this occurred is in Indian Country. Based on the medical evidence that this was non-accidental trauma consistent with battery, that Rantanen was alone with the minor, and that the Victim died as a result, there is probable cause to believe Rantanen is guilty of felony murder (murder during the perpetration of child abuse) or voluntary manslaughter (murder without malice) as well as assault resulting in serious bodily injury. Regarding child abuse second degree, Rantanen is Victim's father and had custody of Victim; based on the nature of the wounds, I submit there is probable cause to believe that Rantanen knowingly or intentionally[4] caused serious physical and mental harm to Victim; and Victim was under 18.

## BACKGROUND REGARDING VERIZON

42. Based on my training, experience, and knowledge, I have learned that Verizon is a company that provides cell phone access to the general public. I also know that providers of cell phone service have technical capabilities that allow them to collect and generate information about the locations of the cell phones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cell phone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone

---

[4] I am informed by the U.S. Attorney's Office that if Rantanen committed the act intentionally or knowingly, he would satisfy the recklessness state of mind.

15

connected. These towers are often a half-mile or more apart, even in urban areas, and can be ten (10) or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cell phone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

43. Based on my training and experience, I know that Verizon can collect cell-site data about **SUBJECT ACCOUNT 1** and **SUBJECT ACCOUNT 2**. I also know that wireless providers, such as Verizon, typically collect and retain cell-site data pertaining to cell phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

44. Based on my training and experience, I know that Verizon also collects per-call measurement data, which Verizon also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cell device from a cell tower based on the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

45. Based on my training and experience, I know that wireless providers, such as Verizon, typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for

wireless telephone service. I also know that wireless providers, such as Verizon, typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify **SUBJECT ACCOUNT 1** and **SUBJECT ACCOUNT 2** user or users and may assist in the identification of co-conspirators and/or potential witnesses.

## CONCLUSION

46. Based on the foregoing, I request that the Court issue the proposed search warrant.

47. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Verizon. Because the warrant will be served on Verizon, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

48. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).